Burtus *v.* Tisdall.

Kings General Term, November, 1848. *Strong, Morse, and Barculo*, Justices.

Burtus *vs.* Tisdall and others.

4  571
82h  55

Where T. & H. members of a partnership firm, who were insolvent, and knew themselves to be so, executed a bill of sale of all their stock in trade, and other personal property, to B., a relative of H., who was a person of no responsibility, and took his four promissory notes, without security, for the amount, which notes the partners divided between themselves, and H. re-delivered the two notes allotted to him to B., the maker; *Held* that the transaction afforded evidence of a design to defraud the creditors of T. & H., and to secure the avails of the partnership property for the use of T. & H., with which design B. was acquainted, and in which he participated; and that the amount due from B., upon his notes, could be reached by judgment creditors of T. & H. upon a creditor's bill, and applied upon their judgment.

It is a clear principle of equity and justice that no man shall be allowed to profit by his own fraudulent acts, or the fraudulent acts of another in which he knowingly participates.

The funds of a copartnership belong to the firm, to the extent of its liabilities; and in case of insolvency the primary distribution of the property should be made to the joint creditors, in preference to the creditors of the partners individually.

Members of an insolvent partnership cannot, by mutual consent, divide the partnership funds between themselves, so as to enable each member to apply the part allotted to him, in a preferred payment of his separate debts, leaving the joint debts unsatisfied.

Burtus *v.* Tisdall.

Such a division between the partners will not relieve the property, while in the possession of the partners, from the equitable priority of the lien of the joint over the separate creditors, nor authorize them to apply it to individual purposes; if the division is made expressly with that design.

And a transfer of partnership property to an individual creditor, in payment of an antecedent debt, with a knowledge on the part of the creditor of such design, will not enable him to hold it discharged from the equitable lien of the partnership creditors.

A witness, discredited upon one point, may be believed upon another point when his evidence is supported by the circumstances, and seems probable. But it is different where an allegation is supported by his evidence alone, or principally, when, confessedly, there can be no one to contradict what the witness says, if untrue; and where his statement is in effect contradicted by the attending circumstances.

In Equity. This was an appeal from a decree of the late assistant vice chancellor of the first circuit. The bill was an ordinary judgment creditor's bill, on a judgment recovered by the plaintiff against the defendants Tisdall & Hickman, in July 1843, for $422,42. It alleged that the defendants Tisdall & Hickman were copartners, as coal dealers, from 1839 until 1843, when the copartnership was dissolved by mutual consent. That previous to such dissolution, and on or about the 13th of April, 1843, Tisdall & Hickman jointly, as copartners, sold and assigned their stock in trade to the defendant Bailey, for the consideration of $1100. That Bailey gave in payment his four promissory notes of $275 each, bearing the same dates, payable to the order of Tisdall & Hickman; two of them being payable in 30 days from the date, and two in 60 days from date. The bill charged, on information and belief, that Hickman, after the delivery of the notes, but before they became due, and without payment of the amount thereof, fraudulently re-delivered said notes, or some one of them, to Bailey, who now pretends that he has paid the said notes, and by collusion with Hickman attempts to defraud the plaintiff and other creditors of Tisdall & Hickman. That Bailey's indebtedness to Tisdall & Hickman, thus contracted, still continues to some extent, sufficient at least to pay the plaintiff; and a discovery was prayed for. The plaintiff insisted that Hickman had no right, in law or equity, to appropriate the notes to the payment of

his own debts. Hickman and Bailey put in answers to the bill, but Tisdall suffered the same to be taken as confessed against him. Hickman, by his answer, admitted the recovery of the plaintiff's judgment, and the issuing and return of an execution unsatisfied; but stated that neither he nor Tisdall & Hickman had, at the time of filing the plaintiff's bill, property to the amount of $100, exclusive of prior just claims. That the bill was filed by collusion with Tisdall. The answer also admitted the execution of an assignment by Tisdall & Hickman to Campbell & Paine, on the 18th of April, 1843, of certain property and debts of the firm specified in the assignment; and a dissolution of the partnership on the 17th or 18th of April, 1843; and that the sale to Bailey was made on the 13th of April. That on the said 13th of April, Bailey made and delivered to Hickman & Tisdall the four notes, two at 60 and two at 90 days. That on the same day the defendant and Tisdall agreed to divide the same, and Hickman took one note at 60 and one at 90 days for his share. That the defendant could not recollect the items of property sold to Bailey, but he believed the sale was made in good faith by Tisdall, as it was by the defendant Hickman. That on a settlement with Bailey on the 14th of April, the defendant delivered up to him two of the said promissory notes, being the two notes that belonged to Hickman, under the division made as aforesaid between him and Tisdall. That on that settlement, Hickman was indebted to Bailey upon a promissory note made by the former, and dated in February, 1841, for $183,87, with interest, for borrowed money; and that the firm of Tisdall & Hickman, and Hickman individually, were perfectly solvent at that time. That Hickman was also, at the time of that settlement, indebted to Bailey in the sum of $113,51 for money paid for Hickman in England; and that Bailey paid the balance of the two notes so delivered to him, $224,15, in cash. And Hickman denied all knowledge as to what had become of the other two notes given by Bailey. In his separate answer, Bailey alleged that on the 15th of July, 1843, when all the notes given by him on the purchase of the property of the partnership were due, Tis-

dall & Hickman owed him $435,97, and claimed the right to offset that sum, at least, from the amount of the two notes taken up from Hickman. He also stated that he had paid Tisdall's 90 days' note, but had refused to pay the 60 days' note; believing he was bound to pay only a part of the sum due thereon. That he was sued thereon in the name of Michael Tisdall, and paid into court the sum of $125,87, and the balance thereof is still due and unpaid, and the defendant has since been advised that he has no legal defence to the claim for the balance.

The cause was heard before the assistant vice chancellor, on pleadings and proofs. The facts, as they appeared in evidence, sufficiently appear from the opinion of the court. The assistant vice chancellor made a decree in favor of the defendant Bailey, dismissing the bill, as to him, with costs; and also in favor of the defendant Hickman, of a like character, crediting the costs on the judgment if the plaintiff should see fit; otherwise the costs to be paid by him, and in favor of the plaintiff against the defendant Tisdall, with costs on the bill taken as confessed.

*J. T. Brady,* for the appellant. I. The sale of Tisdall & Hickman to Bailey, was fraudulent and void, being made with the intent to hinder, delay and defraud creditors. It was made to avoid a levy under the execution on the appellant's judgment. It was made to Bailey, a brother-in-law of Hickman. It was made in great haste, and without any careful consideration of the price Bailey was to pay; the object being an ostensible, but not real transfer of the property. It was attended with a secret understanding that Bailey, though he affected to become proprietor, was in fact acting for the benefit of Tisdall & Hickman and as their friend; though he subsequently proved to be only the friend of Hickman. Bailey was, when the sale was pretended to be made to him, destitute of ability to make the purchase; and this was well known to Tisdall & Hickman. Bailey's notes were taken with the express design, of which he was cognizant, that they should be so appropriated, that cred-

Burtus *v.* Tisdall.

itors of the firm could not reach them. II. If the sale to Bailey be adjudged valid, then the appellant is entitled to a decree against all the defendants, for the four notes given by Bailey to Hickman & Tisdall, or at least, for the amount of the two notes which Hickman returned to Bailey. The notes being partnership property should have been appropriated to the payment of partnership liabilities. (*Jackson* v. *Cornell*, 1 *Sand. Ch. Rep.* 352. *Bristol* v. *Sprague*, 8 *Wend.* 423. *Campbell* v. *Mathews*, 6 *Wend.* 551.) Bailey having received them for a debt which, if it ever existed, was due to him individually, cannot hold them, or their amount, against the appellant, especially. (*Bristol* v. *Sprague*, 8 *Wend.* 423. *Campbell* v. *Mathews*, 6 *Id.* 551.) Because he was familiar with all the business concerns of Tisdall & Hickman. (*Crane* v. *French*, 1 *Wend.* 311.) He knew they were indebted to the appellant. (*Dob* v. *Halsey*, 16 *John.* 34.) He knew they had been embarrassed and would fail, and that they were then in fact insolvent. (*Story*, 197, 210.) He falsely pretended that a debt was due from Hickman, of which there is no evidence, at least, not enough to counterbalance the many facts showing the contrary. (*Egberts* v. *Wood*, 3 *Paige*, 517. *Deveau* v. *Fowler*, 2 *Id.* 400. *Payne* v. *Mathews*, 6 *Id,* 19. *Hutchinson* v. *Smith*, 7 *Id.* 26.) III. The pretence that the notes were, at the moment of their creation, divided so that Tisdall & Hickman each became severally the owner of two, in his individual capacity, is utterly untenable, as against the appellant, because : (1.) The notes were drawn payable to Tisdall & Hickman, for a partnership consideration, and the appellant, as one of the creditors of the firm, on the insolvency, obtained a quasi lien on its effects, which equity will work out for him. (*Ketchum* v *Durkee*, 1 *Barb. Ch. Rep.* 480.) (2.) The proof shows that the division was not, and could not have been made in good faith ; both Tisdall & Hickman knowing of their insolvency and the debt of the appellant ; and having even then determined upon the assignment to Burtus and Pim, which, though executed in April, 1843, was in fact the consummation of a design originated in the February preceding. (3.) Bailey took the two notes

Hickman returned, with full knowledge of facts which prevent his rightfully holding them. He is merely the representative of Hickman. (4.) Hickman was not in truth indebted to Bailey in one cent; and Bailey never contemplated alleging such an indebtedness, except to cover and protect Hickman. (5.) The assistant vice chancellor erred in declaring that the division of the notes between Tisdall & Hickman vested in each the notes he received, as his separate property; even though Bailey, Tisdall & Hickman all knew, before the notes were given, that this division was to be made, and arranged the sale of Tisdall & Hickman's property collusively to facilitate such division. At this time, too, Tisdall & Hickman were insolvent. IV. The position taken in Bailey's answer, that he was a creditor of Tisdall & Hickman, when he purchased their stock, is a sheer fabrication, fraudulently arranged between him and his brother-in-law, Hickman. There is no proof of any such indebtedness. It never appeared on the books of the firm. If Bailey advanced money to the firm, it was refunded; and he was a debtor to the firm. He never claimed from the firm more than the amount of the note he lent to pay Willett for horse feed, and this had been settled. He gave the notes for the purchase of the firm's stock, without a pretence that he had any offset against the amount of the purchase. V. The attempt of Bailey to charge Tisdall & Hickman with the taxes of 60 Cherry-street for 1842, and the rent of 13 and 15 Batavia-street, which fell due May 1st, 1843, is one of the devices contrived by him and Hickman to defeat the appellant. Bailey purchased the stock and property of Tisdall & Hickman, and the leases and good will, just as they stood, exacting no warranty, and perfectly convinced that the amount named for the purchase was a very inadequate one. No evidence was given of any contract or liability of Tisdall & Hickman, to pay the rent and taxes. When Bailey took the two notes, he pretended to do so, as the means of refunding the money he had lent Hickman, and did not pretend that they were given to him for any partnership debt. This shows that the last effort to retain them for a pretended partnership debt is fraudulent. An ac-

Burtus *v.* Tisdall.

count having been stated when the notes were given, it cannot be opened, except on the ground of mistake or fraud on that accounting, neither of which Bailey alleges. Even if Bailey should be adjudged to be entitled to have refunded the money he paid for rents and taxes, he cannot hold the notes in question, or their avails, against a judgment creditor, who has by superior diligence acquired a preference. He must take his place amongst the other creditors of the firm. VI. The assistant vice chancellor erred in not giving to the testimony of Major and Byrne, its proper weight. It contradicted Bailey on a statement materially affecting the merits of the cause, and established that Bailey knew of the insolvency of Tisdall & Hickman, before he united with them in a sale to him, by which they were to make a division and disposition of their assets in fraud of their creditors. VII. The assistant vice chancellor also erred in not decreeing in favor of the appellant as to the two unpaid notes given by Bailey to Tisdall & Hickman. VIII. So much of the decree of the vice chancellor as is appealed from, should be reversed with costs, and a decree made in favor of the appellant as to the two unpaid notes, given by Bailey to Tisdall & Hickman.

*E. S. Van Winkle,* for the respondents. I. The evidence of Byrnes and Major, whereby the plaintiff sought to impeach the testimony of Hickman, was properly excluded by the assistant vice chancellor, because their testimony, as given, only contradicts Hickman on collateral points and not on any issue in this cause, and it is therefore irrelevant. The rule is that a witness may be impeached as to credit, by proof that he has made statements out of court on subjects pertinent to the issue, and the legitimate subjects of inquiry on the trial, contrary to what he swears concerning those subjects, on the trial; but that he cannot be examined on a collateral fact, for the purpose of contradicting him, or that if a party examines him on collateral facts he is bound by his answer. (1 *Phil. on Ev.* 293. 2 *Id. p.* 767, *note* 531. *Spencely, qui tam,* v. *De Willet,*

7 *East*, 108.) II. The defendants Tisdall and Hickman had a right by mutual consent, in the absence of fraud, to divide the notes given them by Bailey for partnership property, and apply them to their separate indebtedness. The rule that partnership property shall be applied to partnership obligations, and separate property to separate debts, is only applicable to a case where the partners voluntarily, as by an assignment, or compulsorily as by bankruptcy, decree, or death of a partner, cease to exercise ownership over the partnership assets, and yet the creditors have not received them—but *not* to a case where BEFORE any *formal dissolution* by the partners, or *lien obtained by creditors*, the partners *by mutual consent* draw out and appropriate the partnership effects to the payment of their private debts. (*Story on Part.* 526, §§ 371, 372, 373. *Coll. on Part.* 507, 515. *Blk.* 4, ch. 2, § 1. *Id.* 334. *Story on Part.* 551, 553, *note* 1, *to* 551; *note* 2, *p.* 552. *Anderson* v. *Maltby*, 4 *Bro. C. C.* 423. *Ex parte Peak*, 1 *Mad.* 357. *Ex parte Harris*, 2 *Ves. & B.* 210, 212. *Ex parte Rowlandson*, 1 *Rose*, 416. *Everingham* v. *Ensworth*, 7 *Wend.* 326. *Grover* v. *Wakeman*, 11 *Id.* 187. 3 *Kent's Com.* 5th ed. 43, *and cases there cited.* *Jackson* v. *Cornell*, 1 *Sand. Ch. Rep.* 348. *Hoxie* v. *Carr*, 1 *Sum.* 181. *McDonald* v. *Beach*, 2 *Blackf.* 55, 58. *Story on Part.* 212. 1 *Bos. & Pull.* 546. *Cary on Part.* 173. *Coll. on Part.* 91.) III. There was no fraud in the transaction between Tisdall and Hickman and Bailey—or between Hickman and Bailey. The partners had a right to sell their property to Bailey, and he, a right to buy. He paid full consideration for them. The bill affirms the sale, and seeks to recover the notes. There was no fraud in the division of the notes by Tisdall and Hickman to be applied to their private indebtedness, for they both consented. No creditor had any lien on them, or right to them. There was no fraud in the settlement between Bailey and Hickman, no matter how close it followed on the giving of the notes. Hickman owed Bailey the money, and thus paid it. There being no fraud, the second point is conclusive of the case. IV. But in any view of the case, Bailey is entitled to offset against any claim of

Burtus *v.* Tisdall.

partnership creditors, his debt against the partnership, due at the time of the bill filed; for the complainant has no superior lien to other creditors, until bill filed. V. The decree of the late assistant vice chancellor should be affirmed with costs.

*J. T. Brady,* in reply. The appellant claims that he should have a decree in his favor, as follows: I. If the sale of 13th of April, 1843, be declared fraudulent or void, as hindering, delaying or defrauding creditors, then Bailey had in his possession at the commencement of this suit $1100 of property belonging to the defendants, Tisdall and Hickman, and should have been decreed to deliver the same, or the proceeds thereof, to the receiver; or if he had not the property or proceeds in his hands, then to pay the sum of $1100 in money to the receiver. II. If the sale be valid, then the notes handed by Hickman to Bailey should be surrendered to the receiver, or the amount thereof paid to the receiver, free from any deduction. III. The amount of the separate debt due from Hickman to Bailey should not be deducted from the amount of the two notes first mentioned, because it *was* a separate debt; nor should the $224,75 be deducted because that was paid by Bailey in his own wrong. The plaintiff should therefore have a decree for the amount of the two notes, and interest. IV. No deduction should be made for any pretended debt from Tisdall and Hickman to Bailey. But if any such deduction should be made, the account should, on the most favorable view for the defendants, be stated as follows:

| | | | |
|---|---|---|---|
| Taxes | $34,06 | | |
| Rent | 128,00 | | |
| Willett note | 119,60 | | |
| | | | |
| | $281,66 | Amts. of 2 notes | $550,00 |
| | | | 281,66 |
| | | Amt. of decree for plff. | $268,34 |

V. But no such deduction should be made; because the plaintiff is a judgment creditor, and should not be postponed to

Burtus *v.* Tisdall.

a creditor at large on a new statement of accounts devised for this case alone.

*By the Court*, STRONG, P. J.   Although the plaintiff does not, in his bill of complaint, directly impeach the sale from the defendants Tisdall & Hickman to the defendant Bailey, yet he calls for a full disclosure of all the particulars of that transaction.   As a creditor's bill is for discovery as well as relief, the plaintiff is at liberty to avail himself of any objections to a proceeding on the part of the defendants affecting his rights, although they may not have been specified by, or even generally charged, in the bill.   The rule results from the necessity of the case; as a creditor cannot be supposed to be thoroughly acquainted with the conduct of his debtor towards third persons ; especially when, as is generally the case in fraudulent transactions, efforts are made to conceal the circumstances from the public.   The call for an account of the disposition of the promissory notes given on the sale, and the objections raised to the manner in which it was alleged by Hickman and Bailey they had been satisfied, cannot be construed into an admission by the plaintiff of the fairness of the sale, or its conclusiveness as to his rights.   A transfer of goods for the use of the persons making the same, although void as to their creditors, is yet valid as between the parties.   The notes given for the purchase money, to the vendors, are choses in action belonging to them, and until they are passed to an innocent holder, for a new consideration advanced by him, may be reached by a creditor's bill.   True, the goods, while in the hands of a fraudulent vendee, may be seized and sold under an execution of one who was a creditor of the vendor at the time of the fraudulent sale. But when, as in this case, the goods are subsequently exposed for sale for a considerable period of time, and many of them doubtless sold, and the residue, if any, so far mingled with other goods that they cannot be identified, and especially when an execution actually issued has proved unavailing, the creditor's only remedy is for the value of the goods, in some shape or other.   A voluntary assignee for the benefit of the creditors

Burtus *v.* Tisdall.

cannot object to a previous sale, although fraudulent; because his title proceeds from the assignor, whose interest is bound by the sale. But the right of the creditor is secured by the statute, and that cannot be affected by the mere fact that the goods have been removed beyond his reach before he could assail the transaction, for the protection of his rights. There cannot be a doubt that the value of such goods can be obtained through a creditor's bill when the vendee is a party. (*Edmeston and Riddle, ex'rs,* v. *Lyde & Walton,* 1 *Paige,* 637.) And that is all for which the plaintiff calls in this case. It is therefore manifestly proper to consider all the circumstances, in order to determine whether Tisdall & Hickman, or the plaintiff as their unsatisfied judgment creditor, have not a claim against Bailey for the value of the goods sold to him, which the plaintiff has an equitable right to have enforced towards the satisfaction of his judgment. It is evident that the firm of Tisdall & Hickman became insolvent a considerable period before the time of the sale. That took place on the 13th of April, 1843. Hickman informed the witnesses Byrne and Major that the firm had intended and prepared to fail in the middle of the previous February, and that they would have done so had it not been for the assistance of Rogers & Co. of Philadelphia. Bailey stated to the witness Roberts that he had been aware of their embarrassments for some time previous to the sale, and that latterly he had not borrowed any money for their accommodation. There can be no doubt that the firm was hopelessly insolvent at the time of the sale. Under these circumstances they executed a bill of sale of all their stock in trade, and the articles of personal property in their two coal yards, to Bailey, who was Hickman's brother-in-law, and, as he himself said, was not worth any thing, for the sum of $1100. No reason is assigned for this extraordinary transaction, by any of the parties. It was concocted and arranged in so private a manner that the sale was not known to Mr. Pim, the principal clerk of the firm, until he was called to subscribe his name as a witness, although he was so much in their confidence that they constituted him one of their general assignees some five days afterwards. Bai-

ley paid no money at the time, but gave his four promissory notes without security, each for one fourth part of the purchase money, payable to Tisdall & Hickman or order, two payable in sixty days, and two in ninety days after date. The notes were divided between the partners within an hour after they were given, and on the following day Tisdall endorsed the two allotted to him to his father, and Hickman delivered the other two to his brother-in-law, the defendant Bailey. It is said, although by no means satisfactorily proved, that the firm was indebted to Tisdall's father to the amount of one of the notes: if so, that was all that was paid to the creditors of the firm; if otherwise, the creditors received no part of the purchase money. Now I am not disposed to judge harshly of the motives of parties, merely from the evidence adduced in a court of justice. I am aware that it often happens, sometimes from the inattention of the parties or their counsel, and sometimes from the strictness of the rules of evidence, that we have not a full history of the case. But here we have the statements of the parties themselves, that is, of Hickman and Bailey, both of whom have answered under oath, and one of them has been examined as a witness for the other; and it is but fair to presume that they have stated all that could be urged in their defence. But after giving all due credit to their statements, I am satisfied that there was a palpable attempt to defraud the creditors of Tisdall & Hickman. The goods were placed beyond the reach of the creditors, and there was an evident design that the avails should be effectually secured for the use of the debtors.

Was this fraudulent design known to Bailey, and did he aid in its accomplishment? He had every opportunity of becoming fully acquainted with the circumstances of Tisdall & Hickman previous to, and at the time of, the sale. He had been on intimate terms with Hickman from the year 1833. They boarded in the same house, in 1840. Hickman married Bailey's sister in 1841. Bailey resided in Hickman's family from August, 1842, until the time of the sale. During that period Bailey was almost daily in the store of Tisdall & Hickman, often

Burtus *v.* Tisdall.

transacted business for them, and had free access to, and occasionally examined, their books; and immediately after the sale Bailey employed Hickman as clerk. He was of course an actor in an unusual and unexplained sale and purchase, and consummated the purchase in a manner which, if it was not unprecedented, was at least very singular. The inference from all this is irresistible, that, let him shut his eyes as much as he pleased, he must have known that the object of Tisdall & Hickman, in making the sale, and receiving, dividing and appropriating the proceeds, was to defraud their creditors, and that he intentionally aided them in effecting their design.

The question is, whether Bailey can be permitted to turn these circumstances to his own advantage so as to obtain a preference over the fair and honest creditor of the fraudulent debtors? It would be most unconscientious—it would be a disgrace to the administration of our laws—if he could be permitted to do so. It is a clear principle of equity and justice that no man shall be allowed to profit by his own fraudulent acts, or the fraudulent acts of another in which he knowingly participates. This would be a sufficient reason why Bailey should not be allowed to interpose his demands against Hickman individually, if they had been clearly proved, nor the payment of money to him to carry out the fraud, so as to prevent the plaintiff from enforcing his claim for so much of the proceeds of the goods of the firm as has not been paid to the firm or its creditors. For this reason alone the plaintiff would be entitled to the relief called for by his bill.

But it may be well in a case circumstanced like the present, to consider the facts and the principle on which Bailey seeks to protect himself from the payment of any part of the plaintiff's judgment. Bailey claims that he had, at the time when the bill was filed, several demands against the firm, which should at all events be credited to him. And he also alleges that he had at the time of the sale several claims against Hickman individually, and that the two notes which were allotted to Hickman were satisfied partly by those claims, and the residue by money paid to him at the time.

Burtus *v*. Tisdall.

There is no satisfactory evidence that the firm was indebted at all to Bailey, at the time of the sale. The fact that negotiable notes for the full amount of the purchase money were given to the vendors, who were known to be insolvent, is strong, if not conclusive, to show that nothing was then due to the vendee. It is satisfactorily proved, however, that subsequent to the sale Bailey paid a note for $119,60, which he had previously given for the benefit of the firm, and also rents and taxes accruing before the sale, amounting to $157,06. He is, I think, equitably entitled to have those sums credited to him, and is only accountable to the plaintiff for the balance, amounting to $273,30, with the interest.

But as far as relates to Bailey's demands against Hickman individually, I am by no means convinced that they remained unsatisfied at the time of the sale. Those demands were, 1st. the amount of a note alleged to have been given by Hickman to Bailey for money lent, dated February 3d, 1841, for the principal sum of $183,87, and 2d. the amount of an account for goods purchased by Bailey for Hickman and his wife in England, and for which he paid $113,50. I am inclined to think that the note was actually given for money supposed to be due at the time it bears date. Bailey and Hickman both swear positively to the fact, and there is no direct evidence to contradict them in this particular. The circumstances stated by them are unusual, but they may be explained by the intimacy existing between them, and the confidence which they reposed in each other. Besides, the note was produced in evidence and its genuineness was proved. So also I think the evidence is sufficient to prove the account for purchases made in England. But the great and insurmountable objection to the allowance of these charges is, that it is no where stated, in the language of several of our statutes, and as it should have been averred, if true, in a matter surrounded by so many suspicious circumstances, that they were due " over and above all discounts." It seems singular that the requisite question to elicit information on this point was not asked, but notwithstanding, I think the statement would have been volunteered if it

Burtus *v.* Tisdall.

could have been truly made. For any thing that appears, there may have been set-offs. There was at least one. Bailey had boarded with Hickman from August, 1842, to April, 1843, about eight months, and for which confessedly nothing had been paid. Hickman says that "where they both came from in England, such a thing as charging a relative board is not known, whatever his circumstances may be." That may all be true and right enough, where the board is actually given by the relative, but it would be considered wrong, probably in England, and certainly in this country, when it is at the expense of his creditors. There a man should be just before he is generous, if that may be called generosity which is at the expense of another. But the generosity in this case seems to have been all on the side of the insolvent debtor. The creditor, while receiving his board gratuitously, thought proper to charge his relative seven per cent interest, and also to demand payment for articles of wearing apparel which he had purchased for his own sister about the time of her marriage. There is, at any rate, strong reason to infer that the two claims in question had been fully satisfied in some way or other, (although possibly they had not been directly paid,) before the sale. As Bailey had known for some time previous to that transaction that the firm was insolvent, and had on that account refused to make loans for them, it is by no means probable that he would have postponed the settlement of his claims so long. Besides, if Hickman had been indebted to him at the time, he would have deducted the amount from the purchase money, and have given his notes only for the balance. He would not have been restrained then, any more than he was the next day, by the consideration that in justice the money should be paid to the creditors of the firm. From these circumstances, we are, I think, warranted in drawing the inference that those claims had been previously satisfied, and were resuscitated for the occasion.

If Bailey in fact paid money to Hickman, and the payment was made in good faith, and without any intention to defraud the creditors of the firm, it should be sustained. But I am not

Burtus *v.* Tisdall.

satisfied that any such payment of money was made. Bailey, it is true, swears positively to the payment, and his oath is responsive to the bill. In such case, the answer is evidence, but it is by no means conclusive. It may be controverted by other evidence, or by the circumstances of the case, which may be proved by other testimony, or admitted. Bailey's statement as to the alleged payment, contained in his answer, is to some extent at variance with the testimony adduced by him. He says that the balance due on the two notes which came into the possession of Hickman, amounting to $224,75, was then, (April 14th, 1843,) paid in cash by him to Hickman, and the two notes were delivered to him, (Bailey,) at the time of the settlement. The allegation is material, as it would have been singular for Hickman to surrender both notes before the whole amount had been satisfied. Hickman says the same in his answer, but he says in his evidence that $170 only was paid at the time, and the balance a few days afterwards. His evidence corresponds with the endorsement on the back of the note which he gave to Bailey ; and both contradict the answer. The discrepancy is not of itself very material, but taken in connexion with other circumstances, has a tendency to discredit the answers, and to destroy their effect. It seems strange that Bailey, after having given his note payable in ninety days, should have paid it immediately. If he had been in affluent circumstances, with the ready command of money, and Hickman had needed it to answer some pressing emergency, the immediate payment would have been natural enough. But Bailey had stated to the witness Roberts, within the preceding year, " that he was not worth any thing, and that he could not get any thing to do ;" and Hickman had asked the same witness if he knew of any one who would be likely to want Bailey's services, or would give him employment. It is evident that he was not engaged in any business, and it is by no means probable that he had the command of money. Nor does it appear that Hickman intended to appropriate the money to answer any existing pressing necessity. On the contrary it is to be inferred from what he says that he

Burtus *v.* Tisdall.

used it for the purpose of answering future expenditures. Neither is it at all probable that Bailey would pay the whole amount of notes due at a future day, leaving unsatisfied and unsecured taxes and rents to a considerable extent, due from the payee and his partner, who were insolvent, and which would still continue a lien on the property for which the notes were given. The whole seems so improbable that we are bound to reject the allegation made in Bailey's answer as to the payment of the two hundred and twenty-four dollars and seventy-five cents, unless it is satisfactorily supported by other evidence. I have already stated that Hickman's account of the alleged payment differs from that given by Bailey. Hickman, however, says that the whole was eventually paid. I have given some effect to his evidence on another point, where it was supported by the circumstances, and seemed probable. In such case a discredited witness may be believed. But it is different when an allegation is supported by his evidence alone, or principally, when confessedly there can be no one to contradict what he says, if untrue, and where his statement is in effect contradicted by the attending circumstances. Hickman is expressly contradicted as to his former assertion of an important fact, which, if it existed at all, must have been known to and remembered by him, by two unimpeached witnesses. He swears that he never said to those witnesses that his firm was prepared to fail in February, 1843. Each of the rebutting witnesses swears expressly that he did make such declaration to them. The assistant vice chancellor supposes that the declaration related to a collateral matter, and therefore could not be controverted. And he directed that the contradictory testimony should be struck out of the case. It is true that a witness' evidence denying a supposed allegation by him in a collateral matter cannot be controverted by other evidence. The rule, however, is one of convenience, not of justice to the witness; for it is as discreditable to him to swear falsely in a collateral matter as in something having a direct bearing upon the merits of the controversy. The subject to which the declaration in this case referred was not, however, entirely collateral; it was material

Burtus *v.* Tisdall.

to determine whether Bailey in fact suffered claims against a known insolvent, having, however, the means, and no doubt the will, to pay them, to remain unsatisfied from that time until the 14th of the following April, and was entitled to considerable weight in the decision of that question. The evidence ordered to be struck out must, therefore, be restored. And with that evidence and the attending circumstances, the testimony of Hickman is insufficient to establish the allegation of payment. If, however, the alleged payment had been fully made out, it could not avail the defendant Bailey, as it would have been evident that it must have been made to carry out an intent to defraud the creditors of the firm, with which he was fully acquainted, and in which he participated.

It was contended on the argument, by the counsel for Hickman and Bailey, that copartners have a right to appropriate, by mutual consent, their joint property to the payment of debts owing by them individually, leaving those of the partnership unsatisfied. That may be true where the firm is solvent, and sufficient is left to satisfy the joint debts. Nothing like insolvency was disclosed in the cases of *Laverty* v. *Burr*, (1 *Wend.* 529,) and *Vallet* v. *Parker*, (6 *Id.* 615,) nor affected the point in controversy in *Everingham* v. *Ainsworth*, (7 *Id.* 326,) which were cited by the late assistant vice chancellor when this cause was decided by him. But the rule in England in cases of bankruptcy is uniform, that the primary distribution must be made to the joint creditors. I cannot see why the same practice should not prevail in this state, in cases of insolvency. It would be manifestly just, and in accordance with well settled principles. The funds of the partnership belong to the firm, to the extent of its liabilities. When the liabilities exceed the effects, the whole are joint property. It is clearly settled that the joint creditors have then the first equitable claim upon the whole, for the satisfaction of their debts. The creditors of the partners individually have such claim only upon their property as individuals. That is only the surplus, where there is any, and where there is none, there is nothing to which it can attach. In all cases of coercive measures, whether at law or in equity,

Burtus *v.* Tisdall.

these rules control. (3 *Vesey*, 238. 4 *Id*. 396. 17 *Id*. 115, 193, 407. 1 *Wight. Exch. Rep.* 50. 4 *John. Ch. Rep.* 525. 16 *John. Rep.* 106. 3 *Denio's Rep.* 125. 3 *Kent's Com.* 37.) Can rules so manifestly just be subverted by the agency of the partners and their separate creditors, to the prejudice, and without the consent, of those having claims against the firm ? That point was discussed in *Wakeman* v. *Grover*, (4 *Paige*, 23,) which was the case of a voluntary assignment of partnership effects for the benefit of the creditors. It was supposed by the counsel for one of the complainants that a preference was given to the payment of an individual over several of the joint debts ; and it was contended that the assignment was so far invalid. The chancellor said that the question was one of great importance to the commercial community ; but he declined deciding it, on the ground that it did not necessarily arise, and was not the main point in the cause. It was again raised by the counsel for the same party when the case came before the court for the correction of errors. (11 *Wend.* 187.) The counsel for the other parties did not controvert the law, but denied its applicability to the facts of the case. Judge Sutherland, who gave the leading opinion, declined discussing the point, for the reasons assigned by the chancellor. Senator Edmonds said that a direction, in an assignment of an insolvent firm, to pay an individual debt of one of the partners, " might be held void as to partnership creditors, but this would be on the principle that the partnership property must first go to pay partnership debts." Independently of authority, I cannot see on what principle an act which is clearly a misapplication of a fund to the prejudice of those who have an equitable claim to it, can be sustained. True the partners, even when they are insolvent, have the general power to sell the partnership effects. This is necessary for the protection of bona fide purchasers ; and besides, when the sale is for a new and sufficient consideration, the funds are not in fact diminished. The purchase money received by the partners supplies the place of the article sold. But it is otherwise where the property is applied in payment of an antecedent individual debt. The alleged power to do that has not the

Burtus v. Tisdall.

same, nor indeed any sound reason, to support it. Insolvent partners should be considered as holding their joint property for the benefit of their joint creditors; and a misappropriation should be deemed in fraud of the implied trust. Unfortunately the protection of the rights of creditors is often the last consideration with insolvents. When they become satisfied of their inability to pay their debts, their remaining property is frequently diverted to inequitable purposes, or squandered with reckless profusion; so that the confiding creditor when driven to a lawsuit, finds at the end of it nothing but "a beggarly account of empty boxes." The power of insolvents over property which justly belongs to their creditors ought not to be extended.

If, as some of the authorities indicate, the prior lien of a joint creditor can be enforced only through the medium and for the benefit of a dissenting partner, then it would seem to follow that an assent by all the partners to transfer their property to pay an individual, in preference to a partnership, debt, might give validity to the transaction. It could not be successfully attacked by the joint creditors. But although one object of establishing the rule may have been to protect the interests of the partners, yet I conceive that it was designed for other and paramount considerations. Why should a rule for the distribution of property have reference to the partners, who, when insolvent, have in reality no interest in it, rather than to the creditors, who, according to acknowledged equitable principles, should be alone interested in its proper destination? Chancellor Kent says, (3 *Kent's Com.* 65,) "The basis of the general rule is, that the funds are to be liable on which the credit was given. In contracts with a partnership, the credit is supposed to be given to the firm; but those who deal with an individual member rely on his sufficiency." Another reason is, that the partnership funds are generally benefited, sometimes created, by the partnership debts; seldom by those due from individual partners. Until I am overruled by the highest authority, I shall hold that the right to the priority in question is, as it should be, for the benefit of the partnership creditors, and can-

Burtus *v.* Tisdall.

not be impaired by any consideration having reference to the interests of the partners, or their individual creditors. The assistant vice chancellor, while admitting that the members of an insolvent partnership cannot assign their property to pay an individual, in preference to a joint debt, supposes that they may divide the funds among themselves, and that then each may apply the part allotted to him in a preferred payment of his separate debts. But what have they to divide? Chancellor Kent says, (3 *Kent's Com.* 64,) "The partnership debts are to be settled before any division of the funds takes place." When the funds are insufficient to pay such debts there is no surplus, nothing to divide, unless the partners are authorized to appropriate to each other property equitably belonging to their creditors. The joint interests of the firm are distinct from the separate interests of the members. By effecting a division, the firm would be making a present to the individual members. A gift to a stranger, to the prejudice of the creditors, would be ineffectual as to them: why would not a donation to each partner be equally so? If we should hold that partners could not so assign their property as to give a preference to individual, over joint creditors, and yet that they could divide it among each other, and then that each might apply the part allotted to him in payment of his separate debts, leaving the joint debts unsatisfied, it would be deciding that an object inequitable in itself might be accomplished by indirect, which could not be effected by direct means; contrary to a general, although possibly not a universal rule. My impression is that a division between the partners would not relieve the property while in their possession from the equitable priority of the lien of the joint, over the separate, creditors, nor authorize them to apply it to individual purposes. It certainly would not if the division should be made expressly with that design. Then a transfer to an individual creditor in payment of an antecedent debt, with a knowledge of such design, would not enable him to hold it discharged from the equitable lien of the partnership creditors. A sale of the divided property, by either partner, to a person not having notice, for a valuable new consideration,

would undoubtedly pass the title free from the lien. But that is not this case. Vice Chancellor Plomer supposes, in the case cited by the late assistant vice chancellor, (*Ex parte Peate*, 1 *Mad. Ch. Rep.* 346,) that a division of the partnership effects for individual purposes might be valid, if fairly made, and no fraud takes place. But how can a transaction be fair and without fraud, which is expressly designed to avoid an equitable lien? It appears to me, with great deference, that the qualification destroys the rule.

If there is no precedent in favor of the rule restricting the action of partners and their separate creditors under such circumstances as exist in the present case, the principle is so evidently just and equitable that I am disposed (in the absence of any well settled rule to the contrary) to make one. If sustained I cannot entertain a doubt but that it will be productive of good.

So much of the decree of the late assistant vice chancellor as directed a dismissal of the bill with costs as to the defendants Hickman and Bailey, must be reversed, with costs. A receiver must be appointed in the usual manner, and with the usual powers. Bailey must pay over to the receiver the sum of two hundred and seventy-three dollars and thirty cents, with interest from the 13th of April, 1843, to be appropriated on the plaintiff's judgment against Tisdall and Hickman. And the defendants must pay the plaintiff's costs.